THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK ANTHONY ROBINSON, | : | Civil No. 3:13-CV-01603 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (JUDGE MARIANI) |
| RICHARD SOUTHERS, *et al.*, | : | (Magistrate Judge Carlson) |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION
### I. INTRODUCTION

Presently before the court are Defendants' Motion for Summary Judgment (Doc.

176), United States Magistrate Judge Martin C. Carlson's Report and Recommendation

("R&R") (Doc. 191) in which he recommends that the Court grant Defendants' motion (*id*. at

40), and Plaintiff Anthony Mark Robinson's objections to the R&R (Doc. 194). As set out in

detail in the R&R, over many years and many decisions, the above-captioned action has

been narrowed to three discrete episodes allegedly involving eight employees of the

Pennsylvania Department of Corrections ("Corrections Defendants"). (Doc. 191 at 3-4.)

Those episodes are 1) Plaintiff's February 12, 2012, suicide attempt and related Eighth

Amendment Failure to Protect claim, 2) the October 2011 to March 2012 requirement that

Plaintiff wear a spit mask when he was removed from his cell and related Eighth

Amendment cruel and unusual punishment claim; and 3) the December 11, 2011,

disciplinary hearing and related Fourteenth Amendment due process claim. (Doc. 191 at 6-

31.) For the reasons that follow, the Court will adopt the R&R as modified and will grant

Defendants' Motion for Summary Judgment (Doc. 126).

## II. BACKGROUND

The R&R provides the following summary of pertinent undisputed facts related to the

claims identified above.

### Robinson's Suicide Attempt

With respect to Robinson's Eighth Amendment failure to protect claim, the parties' competing statements of facts still present an irreconcilable conflict on an essential element of this claim—the question of whether the defendants had a subjective appreciation of the danger which Robinson presented to himself on February 12, 2012. As to this pivotal issue, the parties' positions remain in stark contrast to one another. For his part, Robinson insists that he explicitly warned all three defendants that he was suicidal. In contrast, the defendants flatly deny having ever been informed by Robinson that he was in a suicidal frame of mind on February 12, 2012. (Doc. 178, Exhibit T ¶¶ 29-31). Beyond these factual disputes regarding the events giving rise to Robinson's claim, there is a second legal issue raised by the defendants, upon which we had previously elected to defer action. Specifically, the defendants also contend that Robinson has never grieved any claims relating to this February 12, 2012 incident, and therefore is barred from pursuing this claim due to his failure to exhaust his administrative remedies.

In support of this proposition, the Corrections Defendants provide us with a breakdown of how the grievance system operates in the SMU at SCI-Camp Hill. According to this institution's formal policies, which all inmates have access to, grievances must be filed within 15 working days of the events which would give rise to a grievance filing with "working days" being defined as typical work-week days which exclude weekends and state holidays. (Doc. 178, Exhibits B-1, B-2). We are also presented with a spreadsheet of every grievance filed by Robinson during his stay in the SMU at SCI-Camp Hill. (See Doc. 178, Exhibit C). In total, it appears that Robinson filed 43 grievances, only one of which was filed during the month of February 2012. (Id.) This particular grievance was received on February 1, 2012, prior to his February 12, 2012 suicide attempt, and appears to present some issue with Robinson's property.

(*Id.*) Conspicuously absent from this spreadsheet list is any grievance filed on or within 15 working days of February 12, 2012—the date of the events which would give rise to a grievance. Thus, it appears that Robinson had until March 5, 2012 to file a grievance pertaining to the events on February 12, 2012, accounting for weekends and the President's Day holiday that year.[1] No grievances appear on Robinson's grievance spreadsheet within this time frame. In fact, Robinson did not file any grievances until March 13, 2012 at which time he appears to grieve some issue with office staff at SCI-Camp Hill, an event completely unrelated to Robinson's suicide attempt earlier that month. (*Id.*)

In addition to this grievance spreadsheet, the Corrections Defendants also propound the actual grievances filed by Robinson which demonstrate both his general knowledge of how the prison grievance system functions, and his ability to properly exhaust administrative remedies. (*See* Doc. 178, Exhibits E, F, I, N). In fact, Robinson appealed 21 of his 43 grievances to final review, though only 10 of these were appealed properly despite administrative efforts to correct Robinson's deficient appeals. (*See id.*, at Exhibits D, D-1, E, F, G, H, I, J). Collectively, these items demonstrate that at a minimum, Robinson was familiar with filing grievances, had no qualms doing so, and was indeed on notice of how the grievance system functioned at SCI-Camp Hill.

With these facts established, we now turn to the facts underlying Robinson's Eighth Amendment claim for alleged excessive use of a spit hood precaution.

### Spit Mask Usage

Robinson received certain restrictions between October 2011 and March 2012, including the imposition of a spit mask precaution when Robinson left his cell, triggered by his October 19, 2011 threat to throw feces at two

---

[1] The R&R notes that Plaintiff was on grievance restriction for some portion of the time period in which he could have appropriately filed a grievance for the February 12, 2012, events. The R&R further explains that it appears that this restriction was lifted on February 22, 2012, giving Plaintiff 9 days to file a grievance if he so desired. (Doc. 191 (citing Doc. 178, Exhibit J).) The R&R also notes that the grievance restriction was in place from November 22, 2011, through February 22, 2012, but Plaintiff nevertheless filed five grievances during this time. (*Id.* (citing Doc. 178, Exhibit C).)

correctional officers.[2]  (Doc. 178, Exhibits U, U-1, V, W). Robinson was disciplined for this threatening behavior, and under the SMU Inmate Handbook, Robinson was subject to certain security restrictions since that handbook provided that inmates who threatened, assaulted, or acted out aggressively towards others could be placed on security precautions which would remain in place until the Review Committee is convinced that the threat is over. (Id., Exhibit L). Pursuant to this policy, as a result of Robinson's threatening behavior, prison officials determined that Robinson should wear a spit mask when he was removed from his cell. (Id., Exhibits U, V, W). Officers felt that this security precaution was appropriate due to their prior experience with inmates, including Robinson, who have thrown or threatened to throw bodily fluid or human waste. (Id., Exhibit W). In addition, these officers noted that when inmates' ability to throw other fluids or waste is limited, as when they are handcuffed for transport outside of their cells, they have a tendency to spit. (Id.) Staff continued to use a spit mask when Robinson was being taken out his cell for five months until March 28, 2012, when they removed the spit hood security precaution after Robinson expressed a desire to follow SMU rules and exhibited appropriate behavior for the month leading up to his March 28, 2012 monthly PRC review. (Id., Exhibit S, U, U-1).

Having established these facts, we now turn to the facts underlying Robinson's claim against Defendant Reisinger for alleged due process violations under the Fourteenth Amendment.

### Hearing Examiner Reisinger

While Robinson was confined at SCI-Camp Hill, he was issued a total of fourteen misconducts. (Doc. 178, Exhibit O). Defendant Reisinger, a Disciplinary Hearing Officer, was the hearing official who addressed many of these disciplinary citations. On December 21, 2011, Defendant Reisinger presided over one such disciplinary hearing involving Robinson and Lieutenant Gardner regarding misconduct number B336936. (Id., Exhibit N-1). This particular misconduct citation charged Robinson with using abusive, obscene, or inappropriate language to an employee, refusing to obey an order, and threatening an employee or their family with bodily harm the day before. (Id.) In the course of the disciplinary hearing relating to this citation, Robinson listed

_____

[2] The R&R notes that Plaintiff had in fact thrown feces on another inmate before his arrival at SCI-Camp Hill, wiped feces all over himself and his cell, and had thrown urine on officers.  (Doc. 191 at 8 n.3. (citing Doc. 178, Exhibits W, W-3, W-4).)

his sole witness as the video evidence, but did not otherwise deny the allegations, choosing instead to seek Reisinger's recusal on the grounds that Lieutenant Gardner and Defendant Reisinger were in a romantic relationship. Robinson's claims appears to be entirely speculative. Further, for his part, Lieutenant Gardner denied ever engaging in such a relationship with Reisinger. (Doc. 178, Exhibit U).

On the merits of Robinson's misconduct hearing, Reisinger's report indicated that she watched the video footage from the December 20, 2011 incident, and outlined that the video depicted Robinson engaging in verbally abusive conduct. Given this video evidence, Reisinger found by a preponderance of evidence that Robinson committed these prohibited acts and sanctioned Robinson to 150 days of disciplinary custody time. (*Id.*, Exhibit N-1). Thereafter, Robinson appealed the results of this misconduct hearing, continuing to raise his belief that Reisinger was impermissibly biased due to her alleged romantic relationship with Lieutenant Gardner, though subsequent levels within the appeals process through the final review stage agreed with Defendant Reisinger's assessment of the immutable video evidence depicting Robinson's misconduct, and affirmed her decision. (*Id.*) Thus, Robinson's appeal on this misconduct was dismissed, but he properly exhausted his administrative appeals on this claim.

(Doc. 191 at 6-11.)

Magistrate Judge Carlson concludes that summary judgment should be granted on

Plaintiff's Eighth Amendment failure to protect claim related to the February 12, 2012,

incident because he failed to exhaust administrative remedies on his constitutional claim

pursuant to DC-ADM 804. (Doc. 191 at 19-22.) He also concludes that summary judgment

should be granted on the Eighth Amendment cruel and unusual punishment claim related to

the spit mask because Plaintiff has not produced evidence to satisfy necessary elements of

such a claim and, alternatively, Defendants involved in the situation are entitled to qualified

immunity. (*Id.* at 26-31.) As to the due process claim based on the December 2011

5

misconduct hearing, Magistrate Judge Carlson also concludes that summary judgment is warranted because Plaintiff cannot satisfy necessary elements of the claim and, alternatively, the hearing officer is entitled to qualified immunity. (*Id.* at 33-41.)

Plaintiff raises three objections to the R&R. (Doc. 194.) Regarding the February 12, 2012, incident, Plaintiff contends that Magistrate Judge Carlson did not address whether Plaintiff asserted constitutional claims through the DC-ADM 801 inmate misconduct process. (*Id.* at 2.) Second, Plaintiff maintains that Magistrate Judge Carlson did not address his notification to the Court that Defendants never filed summary judgment on his unlawful withholding of religious, legal, and personal property claim. (*Id.* at 2-3.) Finally, Plaintiff alleges that Magistrate Judge Carlson did not address his request pursuant to Federal Rule of Civil Procedure 56(d). (*Id.* at 3.)

## III. STANDARD OF REVIEW

### A. Report and Recommendation

A District Court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain matters pending before the Court. 28 U.S.C. § 636(b)(1)(B). If a party timely and properly files a written objection to a Magistrate Judge's Report and Recommendation, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id*. at § 636(b)(1)(C); *see also* Fed. R. Civ.

6

P. 72(b)(3); M.D. Pa. Local Rule 72.3; *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

"If a party does not object timely to a magistrate judge's report and recommendation, the party may lose its right to *de novo* review by the district court." *EEOC v. City of Long Branch*, 866 F.3d 93, 99-100 (3d Cir. 2017).  The *de novo* standard applies only to objections which are specific.  *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984).  However, "because a district court must take some action for a report and recommendation to become a final order and because the authority and the responsibility to make an informed, final determination remains with the judge, even absent objections to the report and recommendation, a district court should afford some level of review to dispositive legal issues raised by the report." *City of Long Branch*, 866 F.3d at 100 (internal citations and quotation marks omitted).

## B. Summary Judgement

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under the governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, through summary adjudication, the court may dispose of

those claims that do not present a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).  Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission

at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

In reviewing the evidence, "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil Procedure 56(c)). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of

9

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

As noted above, Plaintiff objects to the R&R on three grounds. Of these, only the first objection relates to the Magistrate Judge's disposition of a claim analyzed in the R&R. Therefore, the only issue addressed in the R&R which the Court will address *de novo* is whether Plaintiff exhausted administrative remedies as to his Eighth Amendment failure to protect claim related to the February 12, 2012, suicide attempt.

## A. Exhaustion of Eighth Amendment Failure to Protect Claim

Magistrate Judge Carlson concluded that Plaintiff did not exhaust administrative remedies related to his Eighth Amendment failure to protect claim because he did not file an inmate grievance on the issue pursuant to DC-ADM 804 which was required before bringing his claim in this Court. (Doc. 191 at 19-22.) Plaintiff does not dispute that he did not file a grievance under DC-ADM 804. (*See* Doc. 194 at 2.) However, Plaintiff maintains that his failure to protect claims were "contemporaneously averred . . . through DC-ADM 801 misconduct procedures" and, therefore, he has exhausted these claims. (Doc. 194 at 2 (citing *Verbanik v. Harlow*, 441 F. App's 931 (3d Cir. 2011); *Ray v. Kertes*, 285 F.3d 287, 297-98 (3d Cir. 2002);

*Green v. Klinefetter*, Civ. A. No. 3:16-CV-2367, 2020 WL 815772 (M.D. Pa. Feb. 18, 2021)).)

DC-ADM 801, the Inmate Discipline Policy, and DC-ADM 804, the Inmate Grievance Policy, are two of the various administrative policies of the Pennsylvania Department of Corrections which allow inmates to challenge aspects of their confinement. "As their names suggest, DC-ADM 804 covers general grievances [and] DC-ADM 801 covers inmate discipline, including the assessment of costs for medical care and losses caused by inmate misconduct." *Hinton v. Mark*, Civ. A. No. 3:10-CV-305, 2017 WL 4342204, at *3 (W.D. Pa. Sept. 29, 2017). At the relevant time, DC-ADM 804 provided in pertinent part that

> [a] grievance *directly related to a specific inmate misconduct charge or a specific disciplinary sanction and/or reasons for placement in administrative custody* will not be addressed through the inmate Grievance process and must be addressed through department policy **DC–ADM 801, "Inmate Discipline" and/or DC–ADM 802, "Administrative Custody Procedures."**

DC-ADM 804 Procedures Manual § 1.A.7 (emphasis in original).[3]

The authority which Plaintiff cites in support of his proposition that he should be deemed to have exhausted his constitutional claim because he could do so through DC-ADM 801 does not provide the suggested support. In *Verbanik*, the Third Circuit panel considered an inmate's attempt to exhaust claims that did not pertain to misconduct charges under DC–ADM 804 (grievance claims), and his

---

[3] The quoted material is the DC-ADM 804 Procedures Manual § 1.A.7 in effect in February 2012. *See Africa v. Dukes*, Civ. A. No. 1:10-CV- 1838, 2012 WL 1313412, at *1 (M.D. Pa. April 17, 2012); *see* http://www.cor.state.pa.us, DOC Policies, DC-ADM 804 § 1.A.7 for current policy.

argument that he had exhausted other claims that pertained to misconduct charges

through misconduct proceedings pursuant to DC-ADM 801 (misconduct claims). 441

F. App'x at 933. The background facts and underlying constitutional claims are not

clearly articulated in the opinion. However, as to the grievance claims, the panel

identifed the question before it to be whether "threats of retaliation can render

administrative remedies unavailable" and agreed with other circuits that "threats of

retaliation against an inmate for pursuing a grievance may make administrative

remedies unavailable to the inmate." *Id.* The Third Circuit panel also concluded

that, given the limited facts presented, it could not determine whether the inmate had

failed to exhaust administrative remedies as to his grievance claims. *Id.* at 934. The

panel separately addressed the DC-ADM 801 misconduct claims. Noting that it was

difficult to exercise its appellate function because of the lack of clarity in the District

Court opinion, the panel explained that

> [t]he District Court concluded that Verbanik failed to exhaust administrative
> remedies regarding claims that did not allege due process violations and that
> he failed to state a due process violation because, in light of *Sandin v.
> Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), he did not
> demonstrate "that he had a constitutionally protected liberty interest that was
> offended by the Defendants' actions in allegedly issuing a false report."

*Verbanik*, 441 F. App'x at 934. It is in this context that the Circuit panel addressed the

uncertainty regarding exhaustion of administrative remedies under DC-ADM 801,

commenting that

[w]e have not yet decided whether or under what circumstances a prisoner may exhaust administrative remedies in the course of misconduct proceedings under DC–ADM 801. *See Ray v. Kertes,* 285 F.3d 287, 297–98 (3d Cir.2002) (noting that the Inmate Discipline Policy is distinct from the Inmate Grievance Review System and declining to hold that a Pennsylvania inmate may satisfy the exhaustion requirement in misconduct proceedings). We decline to do so on this record.

It appears that the District Court dismissed all "non-due-process" claims for failure to exhaust administrative remedies because such claims could not have been raised in the prison disciplinary system. To the extent that Verbanik was required to exhaust through the Inmate Grievance Review System (DC–ADM 804) any claim that could not have been addressed in the Inmate Discipline System (DC–ADM 801), the District Court erred in failing to consider his argument that remedies were not available because he feared retaliation by defendants.

*Verbanik*, 441 F. App'x at 934–35.

Given the circumstances with which the Circuit panel was presented and the qualified nature of its analysis of the viability of exhaustion under DC-ADM 801, *Verbanik* does not provide support for a conclusion that an Eighth Amendment constitutional claim can be exhausted through that procedure so as to allow federal court review.  Rather, at most, *Verbanik* leaves open the possibility that the requirement that an inmate exhaust administrative remedies before coming to court may be satisfied in some circumstances through DC-ADM 801 procedures.

The Third Circuit's earlier consideration of the issue in *Ray v. Kertes* is similarly neutral:

Ray asks us to use this occasion to clarify that a Pennsylvania inmate may satisfy his or her exhaustion obligation in the course of the proceedings charging the inmate with misconduct under the Inmate Disciplinary Procedures.

We decline to so hold. That issue should be considered in the first instance by the District Court because it may require information regarding how prison administrators interpret the scope of the Inmate Disciplinary Procedures, the Inmate Grievance System, and the interaction between them.

285 F.3d at 297–98.

Notably, since *Ray* and *Verbanik*, a Third Circuit panel has more definitively

addressed the issue. In *Howard v. Chatcavage*, 570 F. App'x 117 (3d Cir. 2014) (not

precedential), the panel considered whether an inmate could properly raise an Eighth

Amendment failure to protect claim through the DC-ADM 801 policy. The inmate believed

that the appeal of his misconduct could substitute for exhaustion and the panel concluded

that he was mistaken:

> The purpose of the exhaustion requirement is to ensure that prison officials have a fair opportunity to correct their own errors before the initiation of a federal case. *See Woodford v. Ngo,* 548 U.S. 81, 94–95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *see also Jones* [*v. Bock,* 549 U.S. 199, 219, 127 S.Ct. 910 (2007)]. Howard did not give the defendants such an opportunity here. There is nothing in the record to indicate that Howard's appeal of the misconduct for fighting alerted prison officials to this independent, affirmative Eighth Amendment claim against them, much less afforded them the opportunity to evaluate or remedy that claim before the initiation of this case. Indeed, the inmate grievance process and the inmate discipline process are two separate tracks, the mixing of which is specifically forbidden: "A grievance directly related to a specific inmate misconduct charge ... will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC–ADM 801, 'Inmate Discipline.' " *See* Pennsylvania Department of Corrections Administrative Directive 804, Inmate Grievance System Procedures Manual at § 1.A.7. Nor has Howard demonstrated that the grievance process was unavailable to him.

*Howard*, 570 F. App'x at 118–19; *see also Africa v. Dukes*, 492 F. App'x 251, 253 (3d Cir.

2012) (DC-ADM 801 not appropriate exhaustion procedure because Eighth Amendment

failure to protect claim was not related to misconduct charge for fighting where failure to

protect conduct preceded fight); *Hinton v. Mark*, 2017 WL 4342204, at *1, 7 (DC-ADM 804

necessary exhaustion procedure for inmate who received misconduct related to suicide

attempt and claimed Eighth Amendment deliberate indifference to serious medical needs

regarding prison official's conduct which preceded the attempt).

These more recent cases do not completely foreclose exhaustion through DC-ADM

801. However, they help to clarify what claims are not directly related to a misconduct

charge and, therefore, must be grieved through DC-ADM 804. The facts and circumstances

of this case fall into the latter category in that the prison officials' alleged failure to protect

Plaintiff from attempting suicide preceded the attempted suicide for which he was issued the

misconduct.

This Court's decision in *Green v. Klinefetter*, Civ. A. NO. 3:16-CV-2367, 2020 WL

815772 (M.D. Pa. Feb. 18, 2020), does not change this conclusion. Plaintiff relies on *Green*

for the proposition that "once all the steps of DC-ADM 801 are pursued 'an inmate will be

deemed to have exhausted administrative remedies.'" (Doc. 194 at 2 (quoting *Green*, 2020

WL 815772, at *3).) Plaintiff's reliance is misplaced because the Court did not make a

general pronouncement on the availability of exhaustion through DC-ADM 801 in all

circumstances. Rather, the Court specifically was referring to the "Pennsylvania

Department of Corrections . . . appeal process through which an inmate can appeal a

finding of guilt at a misconduct hearing." 2020 WL 815772, at *3. Here, Plaintiff is not

appealing a finding of guilt at a misconduct hearing and, thus, *Green* provides no support for

his assertion that his Eighth Amendment claim was exhausted through the DC-ADM 801

process. Further, in *Green*, the distinctions between DC-ADM 801 and DC-ADM 804 were

not before the Court and, therefore, to the extent *Green* also addressed the inmate's Eighth

Amendment claim on the merits, no inference can be drawn that the DC-ADM 801 process

can be used to exhaust an Eighth Amendment claim not directly related to an inmate's

finding of guilt at a misconduct hearing.

In sum, the Third Circuit has left open the possibility that exhaustion of a

constitutional claim may be available through DC-ADM 801.[4] However, relevant caselaw

strongly indicates that the possibility of such a claim is not available in the circumstances

presented here.

Despite the lack of clear cut guidance from the Third Circuit on the issue, Plaintiff's

claim would fail even if circumstances exist where an Eighth Amendment failure to protect

---

[4] While this area of the law is uncertain, the exceptions to the exhaustion requirement identified in *Ross v. Blake*, ---U.S.---, 136 S. Ct. 1850, 1859-60 (2016), do not come into play given the facts and circumstances of this case. Evidence does not provide any indication that either the prison grievance process or prison misconduct process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or is "so opaque that it becomes, practically speaking, incapable of use"; or that it is a case "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*; *Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020).

As to "intimidation" from taking advantage of a grievance process, the Court notes that Plaintiff alleged in his statement regarding the February 12, 2012, suicide attempt, Misconduct Number B185104 that Lieutenant Leedom threatened him about taking up the matter in court. (*See* Doc. 178-15 at 15.) Any threats Plaintiff received did not intimidate him from taking advantage of the DC-ADM 801 process as he fully exhausted his appeals related to Misconduct Number B185104 through DC-ADM 801. (*See* Doc. 178-15 at 22.)

16

claim tangentially connected to a misconduct could be exhausted through DC-ADM 801. This is so because, as a factual matter, Plaintiff's assertion that he contemporaneously averred his Eighth Amendment failure to protect claim through DC-ADM 801 is not supported by the record. Plaintiff points to Misconduct Number B185104 which he received for attempting suicide and contends that he fully exhaustive his administrative remedies as to this misconduct. (Doc. 194 at 2 (citing Def.'s Ex. N-2).) Review of the cited exhibit indicates that Misconduct Number B185104 was in fact fully exhausted. (Def.'s Ex. N-2, Doc. 178-15 at 13-22.) However, review of relevant documents contained in Exhibit N-2 also shows that Plaintiff did not assert a failure to protect claim throughout his appeal process. In the "Hearing Supplement Inmate Version and Witness Statements," Plaintiff says that he attempted suicide after reaching a breaking point caused by racism and retaliation. (*Id.* at 15.) He avers that he explained to Sergeant Prayal and Lieutenant Leedom that he "was very stressed and depressed due to their prior abuse and the fact that Superintendent Southers was forcing [him] to wear a 'spit mask' . . . and what they were doing could force [him] to have suicidal thoughts and eventually consider suicide." (*Id.*) Plaintiff further avers that he told Lieutenant Leedom that he felt suicidal and wanted to see someone. (*Id.*) He then says that, after being threatened if he brought this matter to court,

> I continued to express suicidal thoughts, and even tied a sheet around my neck and informed Officer Saez before I hung up. Officer Saez told me that he would tell Lt. Leedom. I hung up before the 2-10 shift came on, yet Lt. Leedom and others left be hanging for the 2-10 shift to find me.

(Doc. 178-15 at 15.)

The "Disciplinary Hearing Report's Findings of Fact, Verdict, and Sanctions Imposed" states that Plaintiff pled not guilty, he reiterated his written statement, he was found guilty, and he was sentenced to 45 days of disciplinary confinement. (*Id.* at 16.) In his appeal of this decision to the Program Review Committee ("PRC"), Plaintiff asserts that he "should have been found not guilty due to mental health reasons. In addition, the policy, procedural, and constitutional violations which lead to my suicide attempt before, during, and after, should be addressed by the PRC." (*Id.* at 17.) The PRC's response upheld the Hearing Examiner's determination, stating that "[t]he evidence presented supports the findings of the Hearing Examiner. The HEX found the misconduct report to be clear and credible. In addition, you note in your written version that you were attempting suicide. You provided no further evidence to support your claims." (*Id.* at 18.)

In his appeal to the Facility Manager, Plaintiff stated that he wanted to appeal the PRC's determination and asked for a remand back to the PRC "for response to each issue raised per DC-ADM 801." (*Id.* at 19.) The Superintendent concurred with the PRC, concluding that "the evidence presented supports the Hearing Examiner's findings and you provide no further evidence to support your claims." (*Id.* at 20.)

Plaintiff next appealed to the Chief Hearing Examiner at the Office of Chief Counsel wherein he asserted that responses to his previous appeals had failed to address each issue raised in the appeals and asked for remand to the SCI-Camp Hill

Facility Manager. (*Id.* at 21.) The Chief Hearing Examiner denied the appeal after a thorough review and in so doing found that "the responses provided by the Program-Review Committee and the Superintendent are upheld in full." (*Id.*)

This sequence of appeals and responses clearly shows that Plaintiff did not mention any specific constitutional claim in the course of appellate review of his misconduct. While, in his initial appeal to the PRC, Plaintiff stated that he "should have been found not guilty due to mental health reasons" and referenced "the policy, procedural, and constitutional violations" which lead to his "suicide attempt before, during, and after" which "should be addressed by the PRC" (*id.* at 17), Plaintiff provided no details regarding any constitutional violation. He was essentially informed of this deficiency with the PRC's determination that he "provided no further evidence" to support his claims (*id.* at 18.) In his subsequent appeals, Plaintiff did not mention any constitutional violation or claim. Thus, as in *Howard*, Plaintiff never alerted prison officials to an independent Eight Amendment claim and never afforded them the opportunity to evaluate or remedy such a claim before he initiated this case. 570 F. App'x at 118-19. Given these circumstances, even if Plaintiff could have raised and administratively exhausted his Eighth Amendment failure to protect claim through DC-ADM 801, he did not do so and his objection fails.

The foregoing analysis results in the determination that summary judgment is properly granted on Plaintiff's Eighth Amendment failure to protect claim related to

his suicide attempt.[5]  The Court will now review Plaintiff's Eighth Amendment

excessive force claim related to the use of a spit mask and his Fourteenth

Amendment due process claim related to the December 2011 disciplinary hearing for

clear error.

## B. Clear Error Review

The Court finds no clear error in Magistrate Judge Carlson's recommendation

that Plaintiff's Eighth Amendment excessive force claim related to the use of a spit

mask should be dismissed.  (See Doc. 199 at 22-31.)   The Court finds no clear error

in Magistrate Judge Carlson's conclusion that Plaintiff's Fourteenth Amendment due

process claim related to the December 2011 disciplinary hearing should be

dismissed.  (See id. at 199 at 31-36.)  This determination results in the granting of

summary judgment on these claims.  With this conclusion, summary judgment is

appropriately granted on all outstanding claims.

## C. Other Matters

In objecting to the R&R, Plaintiff raises two additional matters.  Plaintiff

maintains that the Magistrate Judge did not address his notification that Defendants

never filed summary judgment as it relates to the unlawful withholding of his

religious, legal and personal property claims.  (Doc. 194 at 2.)  He also contends that

---

[5] With this determination, the Court concurs with the recommendation in the R&R that Plaintiff's
Eighth Amendment failure to protect claim be dismissed.  (See Doc. 191 at 22.)  However, because the
Court does so based upon an alternative analysis, the Court will adopt the R&R as modified.

Magistrate Judge Carlson did not address his Federal Rule of 56(d) request for return of his property. (*Id.*)

## 1. Summary Judgment on Withholding of Religious, Legal and Personal Property Claims

In support of his assertion that the Magistrate Judge did not address his notification that Defendants never filed summary judgment as it relates to the unlawful withholding of his religious, legal and personal property claims (Doc. 194 at 2), Plaintiff cites this Court's Order of October 22, 2015, addressing Magistrate Judge Carlson's R&R (Doc. 64) regarding Defendants' Partial Motion for Judgment on the Pleadings (Doc. 55). Plaintiff quotes the Court's notice to Defendants therein that "all of Plaintiff's claims which have not been dismissed remain pending against them, specifically including but not limited to: (1) Plaintiff's claim that Defendants continue to hold his 'religious, legal, and personal property,' (Am. Compl., Doc. 10 at ¶¶ 102, 135)." (Doc. 194 at 2-3.) Plaintiff does not provide any citation or reference any document regarding his own "notification to the Court" that Defendants never filed a motion for summary judgment on the claim. (*See* Doc. 194 at 2-3.)

Although Plaintiff now correctly states that "Defendants were obligated to file a motion for summary judgment as to the Plaintiff's claim of Defendants' unlawful withholding of the Plaintiff's religious, legal, and personal property" (Doc. 194 at 3), the implication that Defendants have not done so is without merit in that Defendants sought summary judgment on this claim in their summary judgment motion filed on

21

January 24, 2017, (See Doc. 122 (citing Doc. 10 ¶ 102, SMOF, Doc. 121 ¶¶ 194-

196).) Thus, the premise on which Plaintiff bases his stated error is flawed.

In the relevant R&R (Doc. 165), Magistrate Judge Carlson concluded that Plaintiff's

property confiscation claims failed as a legal matter. (Id. at 22.) As stated in the R&R,

Magistrate Judge Carlson found that

> [t]he legal basis for these claims is somewhat elusive at times and seems to be
> grounded in Fourth Amendment, due process and retaliation theories, but
> regardless of the legal theory alleged, we find that Robinson has not adequately
> defended these claims in his cursory response to this summary judgment
> motion.

(Doc. 133-1.) The R&R further analyzes the potential legal theories upon which the

confiscation claims may be based although it does not specifically address Defendants'

summary judgment motion as it relates to paragraph 102 of the Amended Complaint.

In an abundance of caution, the Court has specifically reviewed the claim set out in

Doc. 10 ¶ 102 and concludes that Defendants are entitled to summary judgment on this

claim. Although the claim asserted in paragraph 102 is not clearly articulated, Plaintiff

claims impropriety related to SCI-Camp Hill's transfer of property from SCI-Camp Hill to

SCI-Greene upon Plaintiff's transfer to that institution.

In Defendants' Statement of Material Facts Pursuant to Local Rule 56.1, they state

the following:

> 194. When Robinson left SCI Camp Hill in October of 2012, the authorized
> maximum limit of five boxes of personal/written material was sent to SCI-
> Greene. Appendix at H, H-13 Grievances Response #432397.

195. Two boxes of property remained at SCI Camp Hill awaiting Robinson to sign a cash slip with a valid mailing address. *Id.*

196. It was clearly explained to Robinson that if he failed to provide a cash slip and mailing address for his excess property that the property would be destroyed per policy.

(Doc. 121 at 39.) Plaintiff admitted that the authorized limit of five boxes was sent to

SCI-Greene. (Doc. 135 ¶ 194.) Although Plaintiff denied paragraph 195, he did so

based on his questioning of *why* two boxes of property remain at SCI-Camp Hill, but

he did not deny that they, in fact, remained there awaiting him signing a cash slip

and providing a valid mailing address. (Doc. 135 ¶ 195.) Plaintiff denied paragraph

196, but he did so on the basis that Defendants did not provide evidence in support

of the assertion, Defendants did not allow him to inventory his property, and

Defendants did not provide a copy of the policy at issue. (Doc. 135 ¶ 196.)

The record shows that Plaintiff filed a grievance on this issue, Grievance

Number 432397, on October 17, 2017. (Doc. 123-48 at 97.) He states therein that

he signed a cash slip before leaving SCI-Camp to ensure that all of his property

would be shipped with him to SCI-Greene. *Id.* The Initial Review Response is dated

November 17, 2017. (*Id.* at 98.) The response indicates the following: Plaintiff was

informed that he was not authorized to be present during the inventorying of his

property based on security reasons; he was provided a detailed explanation of the

property shipped to SCI-Greene from SCI-Camp Hill; and he was informed that two

boxes remained at SCI-Camp Hill that needed to be "mailed to an address outside of

the DOC" at Plaintiff's expense. (*Id.*) Plaintiff was further advised that

> [o]nce a cash slip with a valid mailing address listed upon it is received by
> Officer Huber, your remaining two boxes of property will be mailed out. If you
> fail to provide the cash slip and mailing address by the exhaustion of the
> grievance process, the remaining two boxes of property will be destroyed. This
> grievance and any requested relief are denied.

(*Id.*) Plaintiff did not appeal the Initial Review Response (*see* Doc. 123-43), nor

does he provide any specific basis for not having done so.

Insofar as Plaintiff seeks to raise a due process or retaliation claim based on the

allegations contained in paragraph 102, such a claim would fail. As set out by Magistrate

Judge Carlson in his general analysis of property confiscation claims,

> inmate due process claims arising out of the confiscation of property are judged
> against settled legal standards, standards which recognize that:

>> Like other constitutional rights, the Due Process rights of
>> prisoners may be accommodated to a prison's legitimate security
>> needs. *See Bell v. Wolfish*, 441 U.S. 520, 558-60, 99 S.Ct. 1861,
>> 60 L.Ed.2d 447 (1979). [Therefore] "[A]n unauthorized intentional
>> deprivation of property" by prison officials does not violate the
>> Due Process Clause "if a meaningful postdeprivation remedy for
>> the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533, 104
>> S.Ct. 3194, 82 L.Ed.2d 393 (1984)(citing *Parratt v. Taylor*, 451
>> U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). Pre-
>> deprivation notice is not constitutionally required. *See id*.

> *Monroe v. Beard*, 536 F.3d 198, 210 (3d Cir. 2008).

> Thus, there are two crucial components to any inmate due process
> claim in this setting: (1) the confiscation of property; and (2) an allegation that
> property was taken and the prisoner was afforded no post-deprivation
> administrative remedy. In this case Robinson has not, and cannot, contend that

he had no post-deprivation remedy since Department of Corrections rules provide for just such a remedy and Robinson actually used those remedies to obtain the return of some property. Therefore, this due process claim also fails on its merits.

. . . [T]o the extent that Robinson attempts to couch these property confiscation issues under the rubric of a retaliation claim, this claim fails for a single, simple reason. Other than generally asserting that these cell searches and property confiscations were in retaliation for his litigation activities, Robinson has not provided us with a factual basis for drawing a causal connection between any specific constitutionally protected actions on Robinson's part, and any cell searches or property confiscations by Huber. In the absence of evidence of some specific causal connection between constitutionally protected activities and property confiscation, these claims typically fail as a matter of law. *Royster v. Beard*, 308 F. App'x 576, 579 (3d Cir. 2009). In short, when "nothing connects the cell search, confiscation of property, and failure to return . . . in-cell property to any particular protected activity," summary judgment in favor of the defendant is entirely appropriate. *Dockery v. Beard*, 509 F. App'x 107, 111 (3d Cir. 2013).

(Doc. 165 at 24-26.)

Although Magistrate Judge Carlson did not specifically analyze Plaintiff's claim regarding the transfer of property from SCI-Camp Hill to SCI-Greene found in paragraph 102 of his Amended Complaint (Doc. 10), the identified legal framework for due process and retaliation claims clearly indicates that relief is foreclosed on either basis. The facts related to Plaintiff's Grievance Number 432397 demonstrate that he was afforded a post-deprivation administrative remedy (*see* Doc. 123-48 at 97-98) for the property which was not transferred to SCI-Greene. Plaintiff presents no evidence that the withholding of property upon his transfer to SCI-Greene was in retaliation for his litigation activities. Thus,

Plaintiff's objection related to the withholding of property presents no basis to reject the R&R

or otherwise grant relief.

## 2.    Federal Rule of Civil Procedure 56(d) Request

Finally, Plaintiff objects to the R&R on the basis that the Magistrate Judge did

not address his request for relief pursuant to Federal Rule of Civil Procedure 56(d).

(Doc. 194 at 3.)

Federal Rule of Civil Procedure 56(d) provides as follows:

**When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by
affidavit or declaration that, for specified reasons, it cannot present facts
essential to justify its opposition, the court may:
**(1)** defer considering the motion or deny it;
**(2)** allow time to obtain affidavits or declarations or to take discovery; or
**(3)** issue any other appropriate order.

Fed. R. Civ. P. 56(d).

Plaintiff provides no citation to the record in support of this claim.  Since the

filing of the relevant summary judgment (Doc. 176) on January 10, 2020, Plaintiff has

not filed a Rule 56(d) affidavit or declaration.  Plaintiff filed three substantive

documents after the summary judgment motion (Doc. 176) was filed and before the

R&R (Doc. 191) was issued on April 2, 2020.  (*See* Docs. 181, 184, 187.)  Plaintiff

mentions Rule 56(d) only in his Brief in Support of Plaintiff's Motion in Opposition to

Defendants' Motion for Summary Judgment wherein he merely states that "summary

judgment should be denied pursuant to Federal Rules of Civil Procedure 56(d)."

(Doc. 187 at 7.)   On this record, Plaintiff's objection regarding Rule 56(d) is without merit in that Plaintiff did not properly raise any issue addressed therein.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's objections (Doc. 194) will be overruled, the R&R (Doc. 191) will be adopted as modified, and Defendants' Motion for Summary Judgement (Doc. 176) will be granted.  A separate Order is filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge